IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| FELITA THOMAS, ADMINSTRATOR OF THE ESTATE OF MATHEW THOMAS, DECEASED, | ) | |
| *Plaintiff*, | ) | Case No. 3:24-cv-00486-RCY |
| v. | ) | |
| PAMUNKEY REGIONAL JAIL AUTHORITY, et al. | ) | |
| *Defendants.* | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS CAMERON K. LINDSAY**

Defendants Pamunkey Regional Jail Authority ("PRJA"), James C. Willett ("Willett"), Matthew Philpott ("Philpott"), Eugene Emelianov ("Emelianov"), Bidemi Adesina ("Adesina"), and Richard Hagen ("Hagen") (collectively "Correctional Defendants"), by counsel, submit this Memorandum in Support of their *Daubert* Motion to Exclude the Opinions and Testimony of Plaintiff's expert witness Cameron K. Lindsay.

**Introduction**

The Correctional Defendants respectfully move to exclude the proffered testimony of Plaintiff's expert witness Cameron K. Lindsay ("Lindsay") under Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, notably *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Lindsay is a retired corrections administrator. He is not a physician, nurse, or medical professional of any kind, and he conducted no scientific or clinical analysis. Despite this lack of expertise, Lindsay opines that the death of Mathew Thomas ("Thomas" or "Decedent") was "foreseeable, predictable, and absolutely

preventable," that the Correctional Defendants "contributed to" and "proximately" caused the death, and that Defendants violated Thomas's Constitutional rights by acting with deliberate indifference. These are legal conclusions grounded in medical expertise that Lindsay does not have. More importantly, however, Lindsay's opinions rest entirely upon improper *ipse dixit* methodology with no foundational support whatsoever. While Lindsay does reference a handful of correctional standards of care, he neither identifies nor applies the standards relevant to this matter, *i.e.*, the correctional standards promulgated by the Virginia Board of Local and Regional Jails.

Lindsay's expert report[1] suffers from three fatal defects: (1) he opines on causation and clinical adequacy with no medical background; (2) he offers impermissible legal conclusions that usurp the roles of the Court and the jury; and (3) his *ipse dixit*, "trust my experience," approach is insufficient to satisfy the requirements of Federal Rule of Evidence 702, *Daubert*, and *Kumho Tire*. Because these defects pervade and define Lindsay's report, the proper remedy is complete exclusion. At a minimum, the Court should strike the medical, causation, legal-conclusion, and state-of-mind opinions.

## **Factual Background**

Plaintiff, as administrator of the estate of Mathew Thomas, a pretrial detainee, filed suit under 42 U.S.C. § 1983, as well as various forms of common law negligence and respondeat superior, alleging that the Correctional Defendants violated Thomas's constitutional rights by being deliberately indifferent to his need for emergency medical treatment and that such

[1] In this case, Lindsay has not yet been deposed because he has made himself unavailable despite the Correctional Defendants' best efforts to make themselves available at any hour on any day of the week to take his deposition. Had he been deposed in an appropriate time frame, the Correctional Defendants' would surely have asked Lindsay to explain his careful wording regarding inmate deaths at his facilities. *See* Ilica Mahajan, How We Cleaned Up and Clarified Federal Data on Deaths in Custody, The Marshall Project (Dec. 23, 2025), https://www.themarshallproject.org/2025/12/23/dcra-leak-clustering-recategorization-methodology.

indifference caused his death in PRJA custody on July 20, 2022. Plaintiff, in her Second Amended Complaint (the "SAC"), alleges that the Correctional Defendants knew or should have known that Thomas suffered from a serious medical condition, necrotizing esophagitis, which required emergency medical intervention, and that instead of providing emergency medical intervention, the Correctional Defendant ignored Thomas's medical concerns, unlawfully placed Thomas on suicide watch, and failed to adequately observe him. The allegations in Plaintiff's SAC, as well as previous iterations, rely almost entirely on unsupported conjecture and assertions which, at the close of discovery, remain clearly refuted by the evidentiary record.

In support of her claims, Plaintiff offers Lindsay as an expert witness to opine on "the correctional operations standards and duties of care applicable to the Pamunkey Regional Jail Authority and its correctional staff with respect to [Decedent]." *See* Expert Report of Cameron K. Lindsay, attached as Exhibit A; *see* Plaintiff's Designation of Expert Witnesses, attached as Exhibit B.

Lindsay's opinions must be excluded because they were formed without review of the relevant and available evidence, and because they lack even the most basic foundational requirements. *See* Fed. R. Evid. 702.

## **Legal Standard**

### A. Federal Rule of Evidence 702

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides that a witness qualified as an expert may testify only if the proponent demonstrates that it is more likely that not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d)

the expert's opinion reflects a reliable application of those principles and methods to the facts of the case. *See* Fed. R. Evid. 702(a)-(d). The proponent of the expert's testimony bears the burden of establishing such admissibility by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592-93).

The trial court serves an important evidentiary "gatekeeper" function which obligates the Court to ensure that any and all expert testimony is both relevant and reliable *before* it reaches the jury. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (extending the gatekeeping function all expert testimony, not solely scientific testimony); *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 261 (4th Cir. 2005). This gatekeeping obligation applies equally to experience-based or technical-testimony, including testimony regarding correctional facility administration and operations as seen here, and scientific testimony grounded in laboratory methodology. *Kumho Tire*, 526 U.S. at 141. Further, the Court "possesses 'broad latitude' to take into account any 'factors bearing on validity that the court finds to be useful.'" *EEOC v. Freeman*, 778 F.3d 463, 466 (4th Cir. 2015) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261(4th Cir. 1999)). The "scope of the court's gatekeeping inquiry will depend upon the particular testimony and facts of the case." *EEOC v. Freeman*, 778 F.3d 463, 466 (4th Cir. 2015) (citing *Kumho Tire*, 526 U.S. at 150).

The Court must first determine whether the witness is qualified to offer an expert opinion in the matter. *Virginia Vermiculite Ltd. v. W.R. Grace & Co-Conn.*, 98 F. Supp. 2d 729, 732 (W.D. Va. 2000). The proponent must establish that the expert is qualified by knowledge, skill, experience, training, or education in the specific subject matter of the proffered opinion. Fed. R. Evid. 702. A general background in a related field is insufficient where the opinion requires specialized knowledge outside of that background, and such qualification is evaluated with respect

to the particular opinion offered, not the expert's credentials in the abstract. *See Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989); *EEOC v. Freeman*, 778 F.3d 463, 472 (4th Cir. 2015) (excluding expert testimony for unreliable methodology).

If the offered expert satisfies the threshold qualification requirement, the Court must assess the admissibility of the proposed testimony with a two-step analysis. *Virginia Vermiculite*, 98 F. Supp. 2d at 735. First, the Court must determine whether the proposed testimony is relevant to the issues of the case, and second, the Court must determine whether the proposed testimony is sufficiently reliable. *Virginia Vermiculite*, 98 F. Supp. 2d at 735; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3rd Cir. 1994) ("any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. *This is true whether the step completely changes a reliable methodology or merely misapplies that methodology*.") (emphasis in original).

Federal Rule of Evidence 702's codification of *Daubert*'s admissibility conditions permits expert testimony on a variety of subjects, so long as such testimony is (1) relevant and (2) reliable. The trial court is obligated to assess the relevance and reliability of such testimony before it is offered to the jury. Expert evidence is relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." As the *Daubert* Court explained, "'an additional consideration under Rule 702 – and another aspect of relevancy – is whether expert testimony proffered in the case is *sufficiently tied to the facts of the case* that it will *aid the jury* in resolving a factual dispute.'" *ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 812 (E.D. Va. 2011) (quoting *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985))) (emphasis added). "That consideration commonly is referred to as 'fit.'" *Id.*

Under Rule 702, expert testimony must also be reliable. The objective of this requirement "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor

that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Courts in the Fourth Circuit assess the reliability of an expert's proffered testimony with consideration of several factors, including: (1) whether the expert's theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory or technique enjoys general acceptance within the relevant professional community. *Daubert*, 509 U.S. at 593-94; *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). These factors are illustrative, not exhaustive or mandatory, and the Court's inquiry should be tailored to the particular facts of the case. *See Kumho Tire*, 526 U.S. at 141, 150; *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).

Finally, otherwise admissible expert testimony may nonetheless still be excluded if its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. Indeed, "expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," and thus "in weighing possible prejudice against probative force under Rule 403," a district court must "exercise more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 596.

**B. 42 U.S.C. § 1983 "deliberate indifference" standard of care**

The standard of care applicable to the Correctional Defendants is the Fourth Circuit's "objective test" established in *Short v. Hartman*, 87 F. 4th 593 (4th Cir. 2023). The *Short* test requires that a Plaintiff "show that the defendant should have known" of plaintiff's "medical condition . . . pos[ing] a substantial risk of serious harm," and failed to "act accordingly." *Id.* at 611. Under the *Short* test, a plaintiff must prove that: (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the

defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed. *Id.* at 611.

An "objectively 'serious' medical condition" required by the *Short* test is one that has been "'diagnosed by a physician as mandating treatment' or is 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id*. at 612 (quoting *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016)). The test further requires plaintiff to show that "the prison official acted with deliberate indifference to inmate health or safety," which requires showing that the official had actual subjective knowledge of both (1) "'the inmate's serious medical condition'" *and* (2) "'the excessive risk posed by the official's action or inaction.'" *Id*. at 612-13 (quoting *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)).

To establish deliberate indifference on the part of the Correctional Defendants, Plaintiff must show: (1) Decedent had a serious medical condition; i.e., one that was (i) diagnosed by a doctor or (ii) so obvious that any reasonable person would recognize the need for emergency medical treatment; (2) the Correctional Defendants failed to act appropriately to address Decedent's serious medical condition; despite (3) knowing, or reasonably should know, the Decedent had the serious medical condition *and* knowing that the Correctional Defendants' inaction posed an unjustifiably high risk of harm to Decedent; and (4) Decedent was harmed because of such inaction.

## **Argument**

Lindsay's expert opinions, as detailed in his report, do not meet the basic requirements of Rule 702 of the Federal Rules of Evidence or the precedent established by the United States Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny,

notably *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). First, Lindsay does not properly establish his credentials to testify as an expert witness—likely because he does not have the proper credentials. Second, his opinions suffer from three major defects: (1) He repeatedly and improperly characterizes Thomas's medical condition; bases his opinions on his perception of medical treatment Thomas allegedly required; and gives numerous causation opinions that he is not qualified to give; (2) His opinions invade the province of the jury as he seeks to opine on ultimate issues by applying his own unique "standard of care" to the Correctional Defendants; and (3) His *ipse dixit* methodology ignores indisputable material evidence; is not based upon any substantive standards, including those he references; and falls far short of the requirements for expert opinions.

**A. Lindsay is not qualified to offer medical opinions.**

Lindsay's entire career in corrections has been in security and administration. He has served as warden, associate warden, deputy regional director, and criminal justice instructor. *See* Ex. A ¶¶ 1-9. He holds a bachelor's degree in criminal justice, and masters degrees in counseling and safety. *See* Ex. A ¶ 8. He is not and has never been a health care professional. He holds no medical, nursing, or health care license and identifies no clinical training of any kind. *See generally* Ex. A. Yet unsupported opinions on core clinical and medical topics form the basis of his report:

- He characterizes Thomas's blood pressure as "critically elevated" and opines on the clinical necessity of medication. *See* Ex. A ¶¶ 69-70.
- He opines that Thomas's condition was "obvious[ly]" an emergency requiring immediate transfer. *See* Ex. A ¶¶ 105, 107, 131, 151.

- He opines on the adequacy of the monitoring and interventions provided by clinical staff. *See* Ex. A ¶¶ 70-73, 112, 136.
- He interprets CCTV footage as showing "seizure-like activity.". *See* Ex. A ¶ 74.
- He opines that the Correctional Defendants' conduct "contributed to" and was a "direct and proximate" cause of death, and that Thomas's death was "foreseeable, predictable, and absolutely preventable." *See* Ex. A ¶¶ 94, 154, 159-60, 162.
- He draws a causal relationship between the Correctional Defendants' alleged custodial failures and the specific cause of death identified by the medical examiner, *i.e.*, acute necrotizing esophagitis with a perforated esophageal ulcer. *See* Ex. A ¶¶ 76, 154, 160.

Lindsay's experience as an operations administrator in carceral settings does not qualify him to testify that a detainee's vital signs, weight loss, or reported vomiting should have triggered a specific response, any more than a hospital administrator's experience in the hospital qualifies him to opine on a surgeon's clinical judgment. *See Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) (holding that expert's qualification(s) must match the specific opinion offered). Whether earlier or different medical intervention would have altered the outcome is a quintessential medical-causation question requiring expertise that Lindsay does not have. His opinion that Thomas's death was "absolutely preventable" is a clinical judgment that necessarily requires knowledge of disease progression and the efficacy of treatment. Lindsay does not have such knowledge. *See* Ex. A ¶¶ 154, 159-60. That the Medical Examiner attributed Thomas's death to "complications of acute necrotizing esophagitis" only underscores that causation here turns on medical questions Lindsay is unqualified to answer.

Because Lindsay's core conclusions depend on unqualified medical opinions, and because those core conclusions are inseparable from his ultimate opinions on liability and causation, his report as a whole is fatally flawed. *See* Ex. A ¶ 96 ("I started my analysis of the issues in this case with a review of what the Correctional Defendants knew, or should have known, about Mr. Thomas's serious medical condition. I then assessed the actions and inactions of the Defendants in their performance of their duty to take reasonable steps to protect all detainees, including Mr. Thomas, from harm and ensure their unimpeded access to adequate medical care while they are in their custody."). Accordingly, Lindsay's report in its entirety must be excluded and he should not be allowed to testify as an expert witness in this case.

**B. Lindsay offers impermissible legal and expert conclusions that are beyond the scope of his expertise.**

An expert may not testify as to whether a legal standard has been met, yet Lindsay's report does precisely that. Lindsay opines that:

- The Correctional Defendants "violated Mr. Thomas' Constitutional rights" and acted "under color of state law." *See* Ex. A ¶¶ 82, 149, 156, 162-64.
- Thomas had a "clearly established right." *See* Ex. A ¶ 157.
- The Correctional Defendants "knew there was a strong likelihood" of harm and "repeatedly disregarded the known and obvious risks," *i.e.*, a recitation of the deliberate-indifference test. *See* Ex. A ¶ 159.
- The Correctional Defendants owed a "non-delegable duty" and that delay "amounts to a denial of treatment," both of which are legal characterizations of duty and breach. *See* Ex. A ¶¶ 119, 123, 136.

- The Correctional Defendants' practices "became the policy of the Pamunkey Regional Jail," through "widespread practice," *i.e.*, the language of municipal-liability doctrine. *See* Ex. A ¶ 150, 163.
- The Correctional Defendants "knew or should have known that their policies, practices, and/or/customs posed substantial risks." *See* Ex. A ¶ 164.
- "Pretrial detainees are entitled to a greater degree of medical care than convicted inmates," *i.e.*, a statement of constitutional law. *See* Ex. A ¶ 81.

These are pure legal conclusions. Telling the jury that the Correctional Defendants were deliberately indifferent and violated the Constitution does not assist the trier of fact; rather, it directs the verdict. Indeed, Lindsay's opinions recite, nearly verbatim, the *Monell* policy-or-custom standard for municipal liability, which is a legal standard on which the Court must instruct the jury. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); s*ee United States v. McIver*, 470 F.3d 550, 561-62 (4th Cir. 2006) ("[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible."). The inclusion of a "reasonable degree of professional certainty" recitation at the report's close does not transform legal conclusions into proper expert opinion.

Not only does Lindsay impermissibly offer legal conclusions, but he applies the wrong standard in reaching those conclusions. Lindsay repeatedly frames his opinions in terms of "deliberate indifference" and "callous indifference and apathy," but that is the subjective *Estelle/Farmer* standard that the Fourth Circuit rejected for pretrial detainee deliberate indifference claims in *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023). *See* Ex. A ¶¶ 99, 109, 147. The applicable standard here is whether the Correctional Defendants' conduct was *objectively unreasonable*; not whether they were subjectively "indifferent" or "apathetic." Lindsay's own

language is internally inconsistent on this point as he alternates between subjective formulations, such as "aware" or "knew," and objective ones, such as "knew or should have known," without ever identifying which standard he is applying or why. *See* Ex. A ¶¶ 121, 155, 159, 164. An expert opinion built on an undefined, shifting legal standard runs afoul of the *Short* framework the jury must apply.

For all these reasons, Lindsay's opinions must be excluded.

### C. Lindsay's *ipse dixit* methodology is unreliable under Rule 702, *Daubert*, and *Kumho Tire*.

Lindsay describes his methodology as follows:

> I employ the same methodology in forming my expert opinions that I employed in the field as an operations administrator . . . gathering the relevant information, reviewing the governing regulatory and industry standards, and assessing the situation . . . through the lens of experience, training, and education [and] this is the same methodology I employed in the field as an operations administrator.

*See* Ex. A ¶ 66. This is a fine description for general professional judgment, but it does not meet the criteria for reliable expert opinions. *Daubert*, 509 U.S. at 593-94.

Indeed, Lindsay's report repeatedly exposes his lack of methodology. The report identifies (1) no articulated standard for distinguishing an actionable "deviation" from an acceptable correctional judgment call; (2) no method another expert could test or replicate, as required by Rule 702(c)-(d); and (3) repeated substitution of Lindsay's own anecdotal practice for the benchmark, *e.g.*, that in twelve years none of his facilities had a comparable inmate death[2], and his

[2] Lindsay's claims in ¶ 110 are especially interesting. Lindsay says, "[i]n twelve years as the warden of five large and complex prisons and jails, none of my facilities ever experienced a suicide, homicide, escape, or death of an inmate or detainee due to medical negligence, gross negligence, and/or deliberate indifference." Notably, whether an inmate has died by "medical negligence, gross negligence, and/or deliberate indifference," is a question of law to be reached by a jury. Indeed, even under the Deaths in Custody Reporting Act (DCRP), which standardized federal reporting of inmate death, an inmate whose death is caused by medical negligence is classified as death "by natural causes." Notably then, Lindsay *does not* say that no lawsuits alleging negligence have ever been brought against a facility he administered. Nor does he acknowledge that even if such a lawsuit had been filed, a pre-verdict settlement would prevent the death at issue from being classified as occurring by negligence because, again, only a jury or judicial fact finder can make that determination.

personal view of how suicide watch "should" occur. Ex. A ¶¶ 110, 151. The unreliability of Lindsay's report is egregious. He treats four clinically dissimilar deaths – an aortic dissection, a suicide by hanging, a Crohn's/sepsis death, and Thomas's esophageal rupture – as a single "pattern" of "dysfunction," without any methodology for grouping them. *See* Ex. A ¶¶ 108, 125-28, 139-41. In fact, one of the referenced deaths, David Finno's, occurred in February 2025, nearly three years *after* Thomas's death and thus could not have placed the Correctional Defendants on notice as to Thomas.

Lindsay's report is also riddled with conclusory advocacy untethered to any standard. He asserts that the Correctional Defendants "did nothing," which is directly contradicted by his own recitation of Thomas's intake screening, Thomas's examination by Dr. Bhat, medication orders, and Thomas's placement on suicide watch. *See* Ex. A ¶ 103. Lindsay further asserts that the Correctional Defendants "failed miserably in every manner," and acted with "callous indifference and apathy" without identifying the metric(s) by which he made those determinations or the ways in which the Correctional Defendants allegedly demonstrated such indifference. *See* Ex. A ¶¶ 113, 147. Lindsay further opines on the Correctional Defendants' state of mind, *i.e.*, that PRJA treats "detainee deaths" as "no big deal" and prioritizes protecting itself over detainees, which no methodology supports and which is independently improper. *See* Ex. ¶ 140.

An opinion connected to the record "only by the *ipse dixit* of the expert" is unreliable and inadmissible. *GE v. Joiner*, 522 U.S. 136, 146 (1997). Courts routinely exclude expert opinions offered on this basis as unreliable "because I said so" testimony. *Freeman*, 778 F.3d at 472 (holding that an expert's methodology must be reliably applied to the facts, not merely invoked); *see Joiner*, 522 U.S. 136; *see Sardis v. Overhead Door Corp.*, 10 F.4th 268 (4th Cir. 2021); *see*

*Oglesby v. GMC*, 190 F.3d 244 (4th Cir. 1999); *see Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530 (D. Md. 2002).

*Ipse dixit* testimony is prohibited because an expert's "conclusions and methodology are not entirely distinct from one another." *Joiner*, 522 U.S. at 146. "[T]he prohibition against allowing *ipse dixit* testimony by experts merely clarifies that the district court's broad discretion includes the discretion to find that there is 'simply too great an analytical gap between the data and the opinion proffered'" *ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 813 (E.D. Va. 2011) (quoting *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 454 n.4 (4th Cir. 2010) (quoting *Joiner*, 522 U.S. at 146)).

### D. Lindsay's opinions are irrelevant because they are directly and unequivocally contradicted by a cursory review of the record.

Lindsay's report is irrelevant, and thus inadmissible, because he formed his opinions without a review of the applicable, and readily available, documentary evidence. Despite Lindsay's contrary assertions, most of his opinions are explicitly rebuked by even a cursory review of the evidentiary record. Starting with Ex. A ¶¶ 93(a)-(z), after sorting through the baseless conjecture and empty statements, Lindsay cites twenty-one (21) American Correctional Association (ACA) and National Commission on Correctional Health Care (NCCHC)[3] standards, including, among others:

> (i) Correctional staff maintain a permanent log . . . that records routine information, emergency situations, and unusual incidents;
>
> (j) Admission process for a newly admitted inmate include . . . medical health screening;

---

[3] Neither ACA nor NCCHC standards are mandatory or binding on PRJA, as Lindsay notes in ¶ 77, where he acknowledges that pursuant to the laws of the Commonwealth of Virginia, PRJA "is subject to the standards promulgated by the Virginia Board of Local and Regional Jails (BLRJ)." Despite this acknowledgement, Lindsay does not identify, quote, or otherwise cite to a single BLRJ standard throughout his report, and does not tie a single event or action at issue to a violation of any BLRJ standard, *i.e.*, the applicable standard in the Commonwealth.

> (p) At the time of admission, all inmates are informed about procedures to access health services; and
>
> (u) An individual health record is maintained for all inmates in accordance with policies and procedures established by the health authority and in accordance [sic] applicable . . . regulations.

Lindsay also references policies and procedures established by the "health authority" as setting the applicable standard yet never identifies what the "health authority" is or which applicable standard(s) the "health authority" established in this instance. *See* Ex. A ¶¶ 93(m), (u), (hh), (jj), (jj(i)). Notably, though, the extensive documentary record shows that PRJA policy, procedure, and practice reflect each and every one of the standards cited by Lindsay. *See* ECF No. 122-1-9.

The report's "opinions" section, ¶¶ 94-148, shows an equally deficient attention to the documentary record Lindsay claims he reviewed in preparing his report. First, most of his "opinions" are pure conjecture and lacking any application to the facts of this case. For example, he asserts, "It is well known in the jail industry that identifying risks of harm or illness on a continuous basis is vitally important to protect detainees from harm." Ex. A ¶ 98. But then he provides no further details on this point.

Lindsay also claims, "[t]he failure of the Defendants to have and/or fail to follow adequate policies and procedures on everyday critical life-safety issues such as being educated on addressing a deteriorating medical condition of a high-risk detainee leaves all vulnerable detainees who suffer from a serious medical condition at risk of physical harm or death. It also indicates indifference toward the basic health and safety needs of their detainees." Ex. A ¶ 99. But he does not identify which policies the Correctional Defendants failed to have or follow; does not explain by which standard(s) he determined Thomas was a "high-risk detainee;" and does not establish that anyone had knowledge of Thomas's deteriorating medical condition.

Lindsay continues, "The evidence demonstrates a systemic issue of a lack of adequate policies, procedures, training, or direction for [PRJA] staff safely handle and house newly arrived detainees . . . like [Thomas], [who] are deemed at risk due to serious medical issues and/or medical emergencies as defined in their written facility policies and procedures." Ex. A ¶ 100. But Lindsay does not identify the "evidence" to which he refers; again does not identify which policies, procedures, training, or direction would be adequate; and does not articulate how he determined Thomas was "at risk due to serious medical issues."

Lindsay further claims, "Defendants failed miserably in every manner to protect [Thomas] from injury because they failed to promulgate and enforce policies relating to his rapidly deteriorating medical condition by refusing to take active steps to ensure he was medically treated." Ex. A ¶ 113. Even ignoring Lindsay's improper medical opinion, he again fails to identify the "policies" the Correctional Defendants failed to promulgate and/or enforce.

Lindsay also opines, "With respect to provided required adequate health care, the sad fact in this matter is that, under the leadership and direction of [PRJA], the [PRJA] has demonstrated an abysmal pattern of failure and dysfunction manifested in lawsuits and litigation. The fact remains that PRJA and its leadership . . . have been named as defendants in numerous civil rights and torts actions brought by inmates who were under their custody and control." Ex. A ¶ 108. Despite his reference to "numerous civil rights and torts actions," the only case he explicitly identifies was a lawsuit involving an inmate death in 2012, which resolved via settlement in 2014. Relatedly, Lindsay fails to acknowledge that *anyone can file a lawsuit*, regardless of the merits, and that allegations prove absolutely nothing.

The most egregious of Lindsay's verifiable falsehoods, however, appears at ¶ 125:

> Unfortunately, [PRJA] has failed to engage in either a meaningful mortality review or an in-custody death review of at least three in-custody deaths; four if one

> includes Mr. Thomas. Post-death reviews of this nature are fundamental, necessary, critical, and align with the industry-accepted minimum standards of the [ACA] and [NCCHC].

This statement completely ignores the *three* different investigations that were conducted in the aftermath of Thomas's death. PRJA internal affairs investigated, the BLRJ Jail Review Committee completed a separate, independent investigation; and the Hanover County Sheriff's Office investigated. Lindsay claims he reviewed each of these investigations in ¶¶ 20-23 yet ignores that none of the three independent investigations found wrongdoing on the part of PRJA or any individual Correctional Defendant.

Such empty and disingenuous "expert opinions" are a hallmark of Lindsay's expert testimony across several topics. *See* Expert Report of Cameron K. Lindsay in the matter of *Waldo v. District of Columbia*, Case No. 19-cv-136 (D.D.C.) (Jan. 23, 2023) (the court excluded his testimony for its reliance on inapplicable guidelines[4]), attached as Exhibit C; *see* Expert Report of Cameron K. Lindsay in the matter of *Ragland v. Shelby Cnty.*, Case No. 2:22-cv-2862 (W.D. Tenn.) (Aug. 29, 2023), attached as Exhibit D; *see* Supplemental Expert Report of Cameron K. Lindsay in the matter of *Ragland v. Shelby Cnty.*, Case No. 2:22-cv-2862 (W.D. Tenn.) (Dec. 14 2023), attached as Exhibit E.

Lindsay's expert report shows a loose understanding of the established facts of the case, a willingness to buff inconvenient facts with his own baseless conjecture, and an unwillingness to reckon with irrefutable facts. Thus, his opinions are inadmissible because they cannot provide the trier of fact with any useful information. The deficiencies in his work well exceed a simple question of credibility; rather, they enter the realm of outright deceit, either by a failure of diligence or affirmative misrepresentation of the facts and circumstances in this case.

---

[4] *See Waldo v. District of Columbia*, 2024 U.S. Dist. LEXIS 115196 (D.D.C. 2024).

## CONCLUSION

For the foregoing reasons, Correctional Defendants respectfully move to exclude the proffered testimony of Plaintiff's expert witness Cameron K. Lindsay, in its entirety, or, in the alternative, to exclude Lindsay's medical, causation, legal-conclusion, and state-of-mind opinions.

Dated: July 2, 2026

**Respectfully Submitted,**

**PAMUNKEY REGIONAL JAIL AUTHORITY**
**BIDEMI ADESINA**
**RICHARD HAGEN**
**JAMES C. WILLETT**
**MATTHEW PHILPOTT**
**EUGENE EMELIANOV**

By: /s/ Scott A. Harris
Counsel

Taylor D. Brewer, Esq. (VSB No. 82041)
Scott A. Harris, Esq. (VSB No. 101525)
Moran Reeves & Conn PC
1211 East Cary Street
Richmond, Virginia 23219
Telephone: (804) 421-6250
Facsimile: (804) 421-6251
tbrewer@moranreevesconn.com
sharris@moranreevesconn.com

*Counsel for Pamunkey Regional Jail Authority, Bidemi Adesina, Richard Hagen, James C. Willett, Matthew Philpott, and Eugene Emelianov*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of July, 2026, I electronically filed the foregoing pleading using the CM/ECF System, which will automatically send a copy of the filing to all CM/ECF participants.

/s/ Scott A. Harris
Taylor D. Brewer, Esq. (VSB No. 82041)
Scott A. Harris, Esq. (VSB No. 101525)
Moran Reeves & Conn PC
1211 East Cary Street
Richmond, Virginia 23219
Telephone: (804) 421-6250
Facsimile: (804) 421-6251
tbrewer@moranreevesconn.com
sharris@moranreevesconn.com

*Counsel for Pamunkey Regional Jail Authority, Bidemi Adesina, Richard Hagen, James C. Willett, Matthew Philpott, and Eugene Emelianov*